## City of Ludlow v. DeVinney.

(Decided October 10, 1919.)

### Appeal from Kenton Circuit Court (Common Law and Equity Division).

1. Municipal Corporations—Barriers on Streets—Sufficiency of—Injury by Use not Intended for.—Where a city erects a barrier on a bridge merely for the purpose of marking the line between the part to be used by foot passengers and vehicles it is not required in its erection or maintenance to anticipate or provide against its being knocked or torn down by persons using it in a way it was not intended to be used. And where such a barrier is knocked down in the footway by boys shoving or pulling it and a foot passenger is injured by stumbling over it the city will not be liable.

2. Municipal Corporations—Barriers—Sufficiency of.—It is only necessary that a city shall so construct and maintain barriers as that they will be reasonably safe and sufficient for the use it was intended they should subserve.

3. Trial—Instructions—Taking Case From Jury.—Courts are reluctant to interfere with the verdict of a properly instructed jury on a disputed issue of fact, but where on the facts there is no room for reasonable difference of opinion the trial court should rule the case as a matter of law.

4. Appeal and Error—Setting Aside Verdict Because Facts Not Sufficient to Sustain.—Although a properly instructed jury may return a verdict for the plaintiff, if the evidence is not sufficient to support the verdict this court may reverse the judgment and order a new trial.

HERBERT JACKSON for appellant.

B. F. GRAZIANI for appellee.

OPINION OF THE COURT BY CHIEF JUSTICE CARROLL—Reversing.

In the city of Ludlow there was a wooden bridge about 165 feet long used by street cars, vehicles and foot

passengers. Some time in the spring of 1916 the city finding it necessary to make some repairs on the bridge diverted the foot passenger traffic from its usual place to that part of the bridge used by vehicles, and in order to confine this traffic to the place on the wagon way set apart for it the city erected a barrier that separated the space to be used by foot passengers from the remainder of the bridge which was to be used by vehicles and street cars. This barrier was made by putting 2x4 posts about 4 feet high across the bridge and putting a railing on top of them made out of 2x4 pieces of timber about 12 feet long which were securely nailed to the posts. The posts were fastened to the floor of the bridge by toe-nailing them to the bridge, four long nails being put in each post. In addition to this many of the posts, but not all of them, were further secured by side braces fastened to the post near the top and to the floor of the bridge about 2 feet from the post.

On the night of November 7, 1916, the appellee, Ethel DeVinney, in company with James Young was walking across this bridge on the part set aside for foot passengers when her feet came in contact with one of the posts or perhaps the railing that had been knocked over on the floor of the footway causing her to fall and receive injuries, to recover damages for which she brought this suit. On trial before a jury she was given substantial damages and the city appeals.

Her cause of action rested on the ground that the city carelessly and negligently constructed and maintained this barrier in such an unsafe and insufficient condition that it fell or was knocked over on the footway of the bridge. It was further averred that the city knew or by the exercise of ordinary care could have known of the dangerous and unsafe condition of this barrier long before November 7th and in ample time to have made the same safe before that date. The answer was merely a traverse of the petition.

The undisputed evidence shows that the barrier was knocked down and caused to fall over on the footway by several half grown boys shaking it; and that the barrier from this cause fell over in the footway just a few minutes before Ethel DeVinney and her escort came along. This being true it is manifest that the city had no opportunity of knowing that parts of the barrier were

obstructing the footway at the time the accident happened. Indeed we do not understand counsel for appellee as claiming that there is any evidence that this barrier was on the footway a sufficient time before the accident to give the city any notice of the fact that it was there.

Under these facts if the city is to be held liable at all its liability must be put on the ground that the barrier was so negligently constructed and maintained as that the city in the exercise of ordinary care might have anticipated that it would fall or be knocked over on the footway by persons pulling or shaking it. Turning our attention now to this feature of the case we will look to the evidence and set forth more in detail the manner in which this barrier was erected and maintained.

Ethel DeVinney testified that she had never before the accident seen any boards or timbers lying in the walk-way but that the railing on the barrier looked like it would fall if anybody fell against it and had been in that condition for a long time. She further said that she did not pay any attention to the condition of the railing until after the accident, but did take particular notice of it afterwards, and her statement that it was in a bad condition before the accident was based on her knowledge of it after the accident.

James A. Young, who was with Miss DeVinney when she fell, said that a good many of the posts on which the railing rested were loose, some leaning one way and some leaning another, and he had noticed them in this condition some weeks before the accident.

T. J. McNeal, who frequently crossed this bridge, testified that on November 6th he was riding in a street car across the bridge and noticed that one of the railings had fallen from the top of a post to the footway, the other end being on another post. This witness further said that he was a carpenter and that the posts could have been made more secure by mortising them in the floor of the bridge than they could by toe-nailing them.

The evidence for the city showed very conclusively that the barrier which was only for temporary purposes while the bridge was being repaired was made out of good, sound material; that occasionally some of the uprights would get loose on account of the vibration of the bridge, and boys pulling and shoving against the posts

and railing; that an employee of the city went over the bridge every day or so and whenever any post or part of the barrier was found loose or out of shape he would repair it.

There was also evidence to show that for many weeks before the accident boys in the neighborhood had been in the habit of sitting and walking on the runners on top of the posts and that they would occasionally pull or shake the posts out of line and that the vibration caused by the traffic on the bridge at times loosened the toe nails and permitted the barrier to get out of line.

The evidence further shows that the city had notice of the habits and conduct of the boys and also the effect on the barrier of the vibration of the bridge and had an employee whose duty it was to notice this barrier and see that it was kept in line and repair.

It thus appears from the undisputed evidence that this barrier was not erected for the purpose of preventing foot passengers from falling over the bridge but was put up on that part of the bridge that had been originally set apart and, until the bridge became out of repair, used for ordinary vehicle traffic and only to mark the part to be used by foot passengers while the bridge was being repaired, and foot passengers when walking in this way set apart for their use could go under the railing on the top of the posts and walk if they wanted to on that part of the bridge used by street cars and vehicles.

It will further be seen from the facts stated that there was no reason why this barrier intended for the temporary use described while the bridge was being repaired should be erected or maintained in the substantial manner that might have been necessary if the barrier had been designed to prevent foot passengers from falling off the bridge.

It may be true that if the posts of the barrier had been mortised in the plank floor of the bridge it would have been more secure and less liable to be knocked or pulled down than if toe nailed as it was to the floor of the bridge, but there can be no doubt about the fact that it was amply sufficient and safe for the purpose it was intended, or about the fact that the accident was not caused by any inherent defect or unsafeness in the barrier but solely because it was pulled or knocked down by the boys.

On these facts it is insisted by counsel for appellee that the city was under a duty to have so constructed this barrier as that it could not have been thrown down, as it was just before the accident happened, by boys shaking or pulling it, and therefore under the further duty of mortising the posts in the floor so that the barrier would not have fallen if the boys had pulled and shoved it as they were in the habit of doing.

We do not think however that the city was under any duty to so construct this barrier as that it could not well have been pulled or knocked down by boys shoving against or shaking it, nor was it required to anticipate that it might have been knocked over in the footway, in the manner shown in the evidence, by boys pulling or shaking it. A city is not required in the erection of a barrier to anticipate or provide against its being knocked or torn down by persons using it in a way it was not designed to be used. It is only necessary that the city shall so construct and maintain the barrier as that it will be reasonably safe and sufficient for the use it was intended to subserve.

If any other rule should be adopted a city could be made liable in damages for accidents occasioned by mischievous or reckless persons who thoughtlessly or purposely might knock or pull down for their own amusement or with a malicious purpose a barrier suitable for the purpose intended and a city would become the insurer of all persons using its streets and public ways against the acts and conduct of everybody through whose conduct or acts people using the streets or public ways might suffer injury.

It would further seem to follow that in every case in which a city placed near a sidewalk or street for building or other public purposes lumber or other material that boys or other persons might and did throw or put as an obstruction in the sidewalk or street to the injury of users the city would be liable, and in almost every instance that can be imagined a town or city might be subjected to damages where an injury was received by anyone using its streets or sidewalks.

It is elementary law that a city is not the insurer of the safety of persons who travel its streets or sidewalks and is not to be held liable in damages for every injury that may befall a traveler. District of Columbia v. Wash-

ington, 43 Wash. Law Reps. 722, 1916C, L. R. A. 379; Swain v. Spokane, 94 Wash. 616, 1917D, L. R. A. 754; American District Telegraph Co., &c. v. Oldham, 148 Ky. 320; City of Covington v. Asman, 113 Ky. 608; Canfield v. City of Newport, 24 Ky. Law Rep. 2213.

It is strongly insisted, however, that as the question whether the city was liable under the facts shown in the evidence was submitted to a properly instructed jury and as the jury found that the city did not exercise the required degree of care, we should not interfere with their finding on the issues of fact. In answer to this argument we may repeat what was said in Town of Elsmere v. Tanner, 158 Ky. 681, in which, in reversing a judgment for damages against the city entered on the verdict of a properly instructed jury upon the ground that the evidence was not sufficient to fix liability on the city, we said:

"It has frequently been observed by this court that it is difficult if not wholly impracticable to attempt to lay down any hard and fast rule by which the liability or non-liability of a city for accidents caused by its alleged failure to keep its streets in reasonable condition for travel, may be measured, and, generally speaking, this condition has made it necessary to leave the settlement of the matter to the jury trying the case. But this often reiterated recognition of the right to have a jury pass on disputed issues of fact in cases like this does not mean that in every case that comes up the issues must be left to the jury, or that because a properly instructed jury find by their assessment of damages that a municipality was negligent, that their finding must be accepted as conclusive, or that a court having the right to review the facts may not reach a different conclusion from that reached by the jury or take the case from the jury. Of course in all cases like this we reasonably and naturally give great weight to the finding of a jury, and when there is reasonable ground for difference of opinion, under all the circumstances, we will not interfere with their finding upon disputed questions of fact or say that the case should not have been submitted to a jury. City of Louisville v. Haugh, 157 Ky. 643.

"But, notwithstanding this reluctance of the courts to invade the field that has been set apart under our system of law as the province of the jury, cases now and then arise in which the courts feel like exercising their dis-

cretion and authority to differ with the jury on the facts and to go so far as to say that the court should rule the issue as a matter of law, and this is one of them.''

The motion to strike the bill of evidence from the record upon the ground that it was not tendered in time in the lower court must be overruled.

The record shows that the defendant city was given and had until September 7, 1917, to tender and file its bill of evidence and exceptions. It further shows that on September 1, 1917, and within the time allowed, the city had a bill of evidence and exceptions ready to tender and file in court but that on that date and continuously beyond September 7th, Judge Harbison, the regular judge of the common law and equity division of the Kenton circuit court, who tried this case, was absent from Kenton county and his court was not open, therefore neither on September 1st nor any time until after September 7th could the city tender or file in court the bill of exceptions and evidence that it had ready to tender and file.

After September 7th and as soon as Judge Harbison returned to Kenton county and opened his court the bill of evidence and exceptions was tendered and filed in his court. Section 334 of the Civil Code provides in part that ''if the judge of said court, for any cause, does not preside at the said term of the court, or no court is held, then the party offering the bill of exceptions shall have until the next term of the court to perfect and prepare the bill of exceptions.''

This provision of the Code was intended to make provision for a case exactly like this, and when it appears as here that the judge is absent or no court is held at the time when the bill of evidence and exceptions should have been filed and that it would have been filed in time except for the fact that the judge who presided at the trial was absent or his court not open then the parties offering the bill may tender and file it in court within seasonable time after the judge who presided at the trial opens his court, and this was done in this case. McFarland v. Burton, 89 Ky. 294.

The judgment is reversed, and if there is another trial and the facts are substantially the same as those appearing in this record the lower court will at the conclusion of the evidence take the case from the jury.